IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARLOS A.E. CABEZAS,<br><br>        Plaintiff,<br><br>  v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant.<br>_____ / | No. C05-02095 MJJ<br><br>**FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW** |

This case having come on for a trial without a jury, and the Court having heard and reviewed the testimony of the witnesses, live and by deposition, and having duly considered the evidence of record, the credibility of the witnesses, the Court file and the arguments of counsel, the Court now enters its Findings of Fact and Conclusions of Law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[1] [2]  Any Conclusion of Law which is deemed to be a Finding of Fact is hereby adopted as such.

**FINDINGS OF FACT**

1.      Carlos Cabezas ("Plaintiff") was born on January 10, 1941, at Guayaquil, Ecuador.  At the time of the shipboard incident on October 31, 2003, he was 62 years old.

2.      Plaintiff was employed by Keystone Shipping Company ("Keystone"), a

---

[1] Plaintiff's Motion in Limine No. 3 to augment the testimony of Timothy O'Connor is granted.

[2] Plaintiff's Motion in Limine No. 4 to file Findings and Conclusions of Law regarding the Discretionary Function Exception is hereby granted.

1  private ship operator, as an unlicensed member of the deck department in the capacity of
2  Bosun ("Bosun") on the M/V CAPE ORLANDO on the day of his accident, October 31,
3  2003.

4      3.      Plaintiff seeks damages as a result of having the tip of his left thumb amputated while he was attempting to untie a line which had been secured to a hand rail on the ship earlier in the day.

      4.      The ship was and is a public vessel of the United States and part of the United States Maritime Administration's ("Marad's") ready reserve fleet of vessels.

      5.      In October of 2003 the CAPE ORLANDO was being manned and operated for Defendant by Keystone. Pursuant to the ship management contract, Keystone employed the ship's crew.

      6.      At the time of the incident giving rise to Plaintiff's claim for damages, the CAPE ORLANDO had been deactivated, put into a reserve operating status ("ROS"), and laid up alongside a dock in Alameda, California with other reserve fleet vessels.

      7.      A crew of ten, including the Plaintiff, were assigned to perform maintenance on the ship while it was laid up. They were also intended to ready it in the event of an activation, and serve as members of its fully manned crew when it was operating and in full operating status ("FOS").

      8.      The maintenance crew of which Plaintiff was a member usually worked regular 8-hour days, without much overtime or weekend work. This schedule allowed Plaintiff to be at home with his family in San Francisco at night and on weekends.

      9.      Plaintiff had sailed as a merchant mariner most of his adult life after emigrating to this country from Ecuador in July of 1965. Plaintiff began his career in approximately 1969 as an "ordinary seaman", an entry level position and he obtained the "able-bodied" seaman's endorsement ("AB") to his Coast Guard issued merchant mariner's document in 1974, and thereafter worked occasionally as a ship's Bosun over other seamen until 1992 when he began working almost exclusively in the capacity of Bosun.

      10.      The term "Bosun" is a shortened version of "Boatswain", referring originally

United States District Court
For the Northern District of California

the foreman or gang boss over those crewmen on sailing ships who did not hold the rank of officer. Sometimes the terms "Bosun's Mate" or "Boatswain's Mate" abbreviated as the rating "BM" for members of the United States Coast Guard and Navy, are used also to describe the responsibilities associated with the status of Bosun.

11. Plaintiff had been hired initially to serve as an AB on the CAPE ORLANDO in January of 2003, but after the ship was activated to carry military cargo to the middle east in February he was promoted to Bosun and he kept his position when the ship returned to the Bay area at the end of May and was put back into ROS in Alameda. As Bosun, Plaintiff was the senior member of the unlicensed ship's force and, in that capacity, typically ran such activities as rigging, splicing, line handling, crane operation, and other traditional work performed by seamen employed in the deck department of a cargo ship and was paid more than the other seamen on board as a result.

12. On the morning of the accident, October 31, 2003, Plaintiff and another member of the ship's force had rigged a large flag, 30' high by 60' long, to fly over the upper deck of the ship in preparation for a ceremony that was to be held onboard on November 1, 2003, the following day. The flag had been flown on the ship on prior occasions, including on May 28, 2003, without incident. Plaintiff had been involved in rigging the flag on May 28, 2003. The rigging of the flag on May 28, 2003 was not the same job as the job of securing it on October 31, 2003, as rigging that occurred on October 31 involved securing the flag to fly in open air with all edges of the flag secured.

13. The flag, when suspended from four corners in the open-air about the vessel, required special knowledge regarding how to rig and unrig it.

14. Prior to raising the flag in May 2003, Chief Mate Turner held a safety meeting among the crew with him and conducted a job hazard analysis of the task of rigging and raising the flag. A job hazard analysis was not conducted before rigging the flag to discuss the manner of securing it on October 31, 2003.

3

15. On October 31, 2003, Plaintiff and an ordinary seaman, Michael Simpson, rigged the flag such that one of the upper corners of it hung from the ship's forward crane hook and the other top corner was attached to a hand rail in the vicinity of the stern crane. The two lower corners of the flag were secured by lines running on one side to a D-ring on the lower cargo deck and on the other corner to a hand railing on a raised walkway on the starboard side of the ship.

16. Sometime after the flag was rigged by Plaintiff and Simpson on the morning of October 31, 2003, Plaintiff noticed that one of its top corners had broken loose. Plaintiff felt it was his duty to raise the flag again. Plaintiff tried unsuccessfully to contact Mr. Grealey before attempting to secure the flag.

17. Plaintiff discovered upon examination of the flag that a grommet on one of the top corners of the flag had torn, so he "rigged" the flag by tying a knot in the material to provide an attachment point to the crane at that corner. He then climbed the forward crane and used it to raise the flag back into its prior position.

18. After raising the flag, Plaintiff had a discussion with two ship day workers, Mike Romo, a rigger, David Kunz, a welder, and Mr. Simpson about the wind having picked up. Plaintiff indicated during the conversation that the wind was getting stronger and that they needed to secure the flag in a manner that would prevent damage to it. Plaintiff decided to change the lead of one of the lower lines, specifically the one attached to the hand rail on the raised walkway, in the belief that the flag might offer less resistance to the wind if it was rigged in a different manner. Plaintiff decided to untie the lower line from the hand rail and pass it down to Simpson so it could be tied off to another D-ring on the lower deck. Plaintiff was not expressly directed to repair the corner of the flag that had become unattached nor was he instructed how to do it.

19. Prior to the first time the flag was raised on the morning of October 31, Chief Mate Grealey told Plaintiff that he did not consider having both of the lower lines running from the flag attached to D-rings on the cargo deck a good idea because the lines could represent a tripping hazard for the crew and visitors coming on to the ship the next day. The

4

attachment of D-ring to the cargo deck is what Plaintiff was attempting to accomplish at the time of his accident.

20. With the three men watching, Plaintiff climbed up onto the starboard side elevated walkway to untie the line and pass it to Simpson. There was room on the walkway for more men to assist him but Plaintiff did not direct any of the other three to join or assist him.

21. Plaintiff knew the wind had been blowing from the starboard side of the ship and observing wind and sea changes were within the ambit of his job responsibilities.

22. Plaintiff pulled line to create slack in it to assist him in his attempt to untie the knot. There was a breeze blowing by the time Plaintiff got to the cat walk to untie the knot.

23. Plaintiff began to untie the knot using his left hand using his right hand to pull some slack into the line. In the process of untying the line, which took between 30-45 seconds, Plaintiff's left thumb was caught in the pinch point between the knot and the railing or the line wrapped around his left thumb. A sudden gust of wind put more strain on the line, and Plaintiff realized his left thumb was caught by the line. Plaintiff yelled for help, but the tip of the thumb above the first joint (the distal phalanx) was severed by the tightening line before the other men could get up onto the walkway to assist Plaintiff. Plaintiff did not use his seaman's knife he carried to cut the line.

24. The crane aboard the ship could have been used to lower the flag to facilitate the reattachment of the corner of the flag where the grommet had torn.

25. The tip of Plaintiff's thumb was retrieved by this fellow workers but could not be surgically reattached.

26. Chief Mate Peter Grealey was away from the ship on permitted leave at the time Plaintiff sustained his injury. Chief Engineer, Stanley Short, was onboard and during ROS he was the senior licensed officer in charge of the ship at time of the accident.

27. Plaintiff did not obtain guidance from any superior who was present as to how to approach the task of rigging the unattached line, or to determine if it was necessary to move the line.

5

28. No emergency or urgency existed at the time Plaintiff attempted to repair the flag and sustained his injury.

29. Both Ordinary Seaman and Bosun's alike understand the need to be careful when dealing with lines under or subject to tension and the danger associated with placing themselves or any part of their body within the "bite of the line."

30. The Court rejects the testimony of Plaintiff's sailing expert testimony that the failure to install a cleat(s) on the catwalk as a mechanism to secure the flag as unreasonable and lacking persuasive force. Based upon the record, the Court finds that installation of cleats in the manner suggested by Mr. Kamen would have created a greater risk of hazard of tripping or fouling than it would have alleviated with respect to securing of lines on the CAPE ORLANDO. Moreover, the Court finds that the record clearly establishes that securing lines of the type involved in the incident at issue by attaching them to ship railings was reasonable and standard operating procedure on vessels such as the CAPE ORLANDO

**DAMAGES**

31. Plaintiff's position as Bosun was filled by a temporary worker in anticipation of his return, however, he never returned to work.

32. Plaintiff remains under the care of Dr. Wu for pain and tingling in the stump end of his left thumb and in the palm area between it and his left index finger. Dr. Wu performed a revision procedure to remove a neuroma once the amputation wound had became stable in March 2005. Dr. Wu has recommended that Plaintiff be fitted with a prosthetic thumb for cosmetic reasons and has made no recommendation for future care or treatment of Plaintiff's thumb.

33. The passage of time between the amputation and the revision procedure resulted in a successful outcome for Plaintiff because it allowed his thumb to achieve maximum healing before the surgery was performed.

34. Plaintiff would not be able to return to seafaring work because of inability to grip railings and lines with his left hand in an emergency and in rough seas and weather.

35. Plaintiff had been not fit for sea duty from October 31, 2003 to March 8, 2006.

6

As of March 8, 2006, Plaintiff has been determined to be permanently not fit for sea duty.

36. Plaintiff's vocational rehabilitation expert opined that Plaintiff could find employment as a security guard, a job which pays from $9.00 up to $12.25 per hour in the Bay Area. Plaintiff, however, has not tried to find employment of any kind since the October 2003 accident.

37. Plaintiff began seeing a psychologist, Dr. Rosales, in the fall of 2005. Plaintiff's diagnosis is "depressive disorder, single episode" and pain disorder. There is a causal relationship between Plaintiff's diagnosis of depressive disorder, pain disorder and the injury to his thumb sustained in the October 31 shipboard incident. These disorders were not in full remission as of June 2006, and will require nine to twelve more treatments over a period of five to six months at $125.00 a session to gain remission and an additional nine to twelve sessions after reaching full remission.

38. Plaintiff has been diagnosed as suffering from "sleep apnea." Plaintiff's condition of sleep apnea is not casually related to the depression arising from the October 31 shipboard incident. Plaintiff's condition of an enlarged prostrate is not casually related to the October 31 shipboard incident.

39. Keystone has paid Plaintiff the standard $8.00 per day for "maintenance" as provided in his union contract through the present time.

40. Plaintiff's future medical treatment/cure consists of:
    a. Up to 12 future treatments to achieve remission at a total cost of $1,500.00;
    b. Post remission therapy at a total cost of $1,500.00, and
    c. A Pillet prosthesis at a cost of $4,200.00.

41. Plaintiff would have worked to age 65.5.

42. Plaintiff sustained a loss, net of taxes and in present value of $168,176 including fringe benefits including:
    a. past loss to time of trial of $139,352.00;
    b. future wage loss in the amount of $28,824.24;

c. Past and future pain and suffering in the amount of $200,000.00;

d. Future medical treatment in the amount of $3,000.00 (12 future treatments to achieve remission and post remission therapy); and a Pillet prosthesis at a cost of $4,200.00.

43. Plaintiff filed this suit on May 20, 2005.

## CONCLUSIONS OF LAW

1. This case for personal injury damages against the United States by a seaman employed on a Marad vessel presents an admiralty and maritime matter within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure, and is governed by the provisions of the Clarification Act, 50 U.S.C. Appx. §1291(a), which incorporates the provisions of the Suits in Admiralty Act (SIAA), 46 U.S.C. §§741-752.

2. Plaintiff asserts claims for both negligence on the part of the United States as owner of the ship, and vessel unseaworthiness.

3. Plaintiff's negligence cause of action is based on the Jones Act, 46 U.S.C. § 688, which in turn incorporates the standard of liability enunciated in the Federal Employers' Liability Act, 45 U.S.C. § 51 (FELA).

4. The duty of a shipowner to a seaman is limited to furnishing a vessel, and appurtenances thereto, which are reasonably fit for their intended use. Mitchell v. Trawler Racer, 362 U.S. 359 (1960); Bilger v. Maritime Overseas Corporation, 362 U.S. 539, (1960).

5. The burden of proving the unseaworthiness of a vessel or the negligence of a shipowner rests entirely and absolutely on the seaman plaintiff. See, Ramos v. Matson Navigation Company, 316 F.2d 128 (9th Cir. 1963)  Matter of Heckinger, 890 F.2d 202 (9th Cir. 1989), cert. denied., 498 U.S. 498, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).  He must prove that some unseaworthiness and/or negligence was a proximate cause of his injuries. Matter of Hechinger, supra; Ramos v. Matson, supra; Moore v. United States, 347 F. Supp. 38 (N.D.Cal.1972).

6. The Court rejects, on this record, Plaintiff's factual and legal contention that using the hand railing on the raised walkway on the starboard side of the ship to tie off the

8

lower line running from the flag was unseaworthy as a device given the dynamic load acting upon the flag.  The evidence before the Court persuasively establishes that lines of the type involved in this incident are commonly tied to hand rails on ships notwithstanding dynamic loads.

7. The Court rejects the testimony offered by Plaintiff, including that of Mr. Kamen, that the failure to design placement of cleats on the deck of the CAPE ORLANDO wherever lines might need to be tied established negligence or vessel unseaworthiness on the record before the Court.  Mr. Kamen does not qualify under Federal Rule of Evidence, Section 702, to opine on this subject.  Moreover, Mr. Kamen's testimony was not persuasive on the issue of design and placement of cleats on the deck regarding attachment of lines when weighed against the testimony presented by Defendant's witnesses on this issue.

8. The Court finds that a job hazard analysis was reasonably required in advance of the October 31 rigging of the flag and Defendant's failure to conduct such an analysis constitutes negligence.  Moreover, the Court finds, based on the evidentiary record that a reasonably prudent vessel operator would have understood that rigging a flag of this size under a dynamic load required a job hazard analysis and instructions from the Chief Mate regarding how to handle a line under dynamic loads such as the rigging of the flag on October 31, where the flag was to fly in open air with all edges of the flag secured.  Based upon these findings, the Court concludes that Plaintiff has established that Defendant was negligent and/or that the vessel was unseaworthy and that Defendant's negligence proximately caused his injuries.

9. The Court finds that the safety hazards incumbent in rigging the flag to fly in open air with all edges of the flag secured were not obvious.

10. The Court rejects Defendant's legal contention that Plaintiff breached a primary duty of his employment in performing a duty imposed upon him by his employment as the evidentiary record does not credible support this legal contention.

11. A Plaintiff's recovery, if any, must be reduced by the percentage his own negligence contributed to any damages he is found to have sustained as a result of the

9

incident. Subingsubing v. Reardon Smith Line., 682 F2d 770 (9th Cir. 1982). This is a valid defense in maritime law and is to be distinguished from the improper assertion of the defense of assumption of the risk. Socony-Vacuum Oil Co. V. Smith, 305 U.S. 424, 431-432, (1939). Defendant has the burden of proof to establish some negligent act or omission by the plaintiff. The comparative negligence defense "requires evidence of some negligent act or omission by the plaintiff other than his knowledgeable acceptance of a dangerous condition." Tolar v. Kinsman Marine Transit Co., 618 F.2d 1193, 1196 (6th Cir. 1980).

12. The Court finds that on this record Defendant has established that Plaintiff's negligence contributed to the injury sustained by Plaintiff but that he was not, as Defendant contends, solely at fault given Defendant's failure to conduct a hazards analysis prior to rigging the flag. The Court finds that Plaintiff failed to exercise reasonable care under the circumstance and was contributorily negligent in his acts or omissions in that:

a. Plaintiff undertook to re-raise the flag on October 31 after discovering it had fallen absent an express order to re-raise the flag;

b. Plaintiff failed to obtain guidance regarding the most prudent way to re-raise the flag even though there was no urgency or emergency that required the flag be re-raised immediately;

c. Plaintiff acted unreasonably in that in attempting to untie the knot in the line--a line subject to tension--as an experienced Bosun by placing his thumb within the "bite of the line."

d. Plaintiff acted unreasonably in failing to spend time testing the tension on the line with both hands to see if it was possible for him to hold slack in the line manually;

d. Moreover, the Court finds that Plaintiff, in his capacity as Bosun, had other reasonable alternatives available to him to safely move the line without risking injury including, but not limited to, the use of additional men, using the crane to lower the flag or waiting for additional instructions or orders in that no emergency or urgency compelled Plaintiff to take the action he engaged in that led to his injury.

13.     Having found that the Plaintiff was contributorily negligent, the Court finds that Plaintiff's negligence was 30% responsible for his accident and his recovery will be reduced accordingly.

14.     A Plaintiff also has a duty to use reasonable diligence to find suitable employment to mitigate his damages. Burden v. Evansville Materials, Inc., 636 F.Supp. 1022 (W.D.Ky. 1986), aff'd 840 F.2d 343 (6th Cir. 1988).  The Court finds on this record that plaintiff has an obligation to mitigate damages and that Plaintiff is employable as a security guard.

15.     A seaman can only recover for certain elements of damages: (1) lost wages; (2) medical expenses and care; (3) impairment of future earning capacity; and (4) pain and suffering arising from the injury.  Dowie v. Unites States Lines, Co., 359 F.2d 344 (3rd. Cir. 1966), cert. denied, 385 U.S.897, 87 S.Ct. 201, 17 L.Ed. 2d 130 (1966).

16.     Any damages recovered by the plaintiff including any award for pain and suffering are to be reduced to present value, Jones & Lauglin v. Pfeifer, 462 U.S. 523 (1983), and also reduced to cover federal and California state income tax payments, Norfolk v. Western Railroad Co v. Liepelt, 444 U.S. 490 (1980), rehearing denied, 445 U.S. 972 (1980).

17.     Pursuant to 46 U.S.C. Section 743, any interest awarded to plaintiff may only be awarded against the United States at a rate no greater than the statutory rate of 4 (four) percent, Firth v. United States, 554 F.2d 990 (9th Cir. 1977), and interest may only be awarded from the date that plaintiff filed suit. In this case, Plaintiff filed suit on May 20, 2005.

18.     As a result of the above Findings of Fact and Conclusions of Law, the Court finds that Plaintiff was caused to be damaged as more fully set forth below.

Plaintiff sustained a loss, net of taxes and in present value of: (includes fringe benefits):

a. past loss to time of trial of $139,352.00;

b. future wage loss in the amount of $28,824.00;

c. Past and future pain and suffering in the amount of $200,000.00;

1    d. Future medical treatment in the amount of $3,000.00 (12 future treatments to
2 achieve remission and post remission therapy); and a Pillet prosthesis at a cost of $4,200.00.
3    19.    Plaintiff's recovery is to be reduced by 30% as a result of his own negligent
4 conduct.
5    **IT IS SO ORDERED**.
6 Dated: September 28, 2007

_____
Martin J. Jenkins
United States District Judge